*In re* MARRIAGE OF ELIZABETH SKAHN, Petitioner-Appellee, and KENNETH SKAHN, Respondent-Appellant.

First District (5th Division)   Nos. 85—2987, 85—3070, 86—0097 cons.

Opinion filed November 14, 1986.

Lois Solomon, of Solomon & Behrendt, of Chicago (Charlotte Adelman, of counsel), for appellant.

Beerman, Swerdlove, Woloshin, Barezky & Berkson, of Chicago (Howard A. London, of counsel), for appellee.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

In consolidated appeals from certain orders in an action for dissolution of marriage, respondent contends that the trial court erred in (1) failing to ascertain the value of the parties' assets prior to rendering its distribution order and (2) ordering him to (a) reimburse petitioner for expenditures she made and (b) pay excessive attorney fees.

On September 13, 1985, judgment was entered dissolving the marriage of Elizabeth Skahn (petitioner) and Kenneth Skahn (respondent), awarding the parties joint custody of their 14-year-old son, and apportioning their property and assets. Testimony and evidence presented at trial established that the parties were married in May 1970 and separated in February 1983. At the time of dissolution, respondent, age 42, was employed as a civil engineer by the United States Environmental Protection Agency at an annual salary of approximately $39,000, from which he received a net income of $2,026 per month. Petitioner, age 37, had been trained as a draftsman but had not been employed in that field since 1980. Since that time she worked periodically as a secretary and as a manager of various small businesses for which she earned net salaries ranging from $98 to $200 per week. At the time of trial, petitioner was unemployed and in reasonably good health. Because this appeal relates only to the propriety

of the orders pertaining to the property division and attorney fees, it is unnecessary to summarize the remainder of the extensive record of the numerous hearings preceding the judgment. Rather, we will incorporate only those portions of testimony and evidence, and the trial court's findings thereon, which are relevant to the issues as they are discussed.

In its written order, the trial court awarded to each party one of their two automobiles, all jewelry, gifts and nonmarital property acquired before and during the marriage, and a 50% interest in the benefits accrued in respondent's pension plan during the marriage. The trial court also awarded to petitioner all interest in two parcels of jointly owned real estate and the majority of their household furnishings and ordered respondent to pay her attorney fees and to reimburse her for certain expenditures she had made prior to the dissolution.

OPINION

Respondent contends generally that the portions of the judgment relating to the property distribution must be reversed and this cause remanded for a new trial thereon because the value of the property was not established at trial and, thus, it cannot be determined whether the overall disposition was equitable.

■■ Turning first to the pension plan, respondent argues that Illinois law provides that the trial court may award each party a percentage of a distributable pension plan only where its present value cannot be ascertained or where no other marital property is available to offset the pension award (*In re Marriage of Hunt* (1979), 78 Ill. App. 3d 653, 397 N.E.2d 511), and that in this case the 50% interest awarded to petitioner was inappropriate because (1) the present value of the pension could have been determined by actuarial evidence and (2) there was other marital property of unknown value awarded to petitioner which offset the pension benefits.

Not only do we believe that respondent has oversimplified and, thus, distorted the holding in *Hunt*—in which the primary issue was whether the parties' pension plans were marital property—but also that *Hunt* and the other authorities cited by respondent are factually distinguishable from and, therefore, inapplicable to the case at bar. In fact, after a review of the record in its entirety, we find respondent's argument that they are controlling to be disingenuous at best.

Following certain stipulations at the first hearing on this case, the trial court asked the attorneys:

"What about his pension plan? We have to know and the court

has to have this information on the record. This is required of us. We've got to know what his pension will bring him, if and when. I've got to know specifically and positively for the record as to whether its a distributable asset. Under normal circumstances all pension rights are assets which are distributable by a court, so you'd better be careful what you're doing here."

In an ensuing discussion, respondent himself informed the court of the exact amount he had contributed to his pension fund as of three months earlier, the percentage of his gross wages deducted from his paycheck each month for the pension, and the approximate monthly benefit to which he would be entitled based on the total amount of contributions made during the marriage when the pension became payable, following which a stipulation was entered into by the attorneys as to these figures. At the next hearing, when the subject of the pension arose again during examination of respondent by petitioner's attorney on matters relating to his income and expenses, the trial court interjected:

"I want to know what those figures are. I will ask that I be given a summary of what this man earns with the proper deductions.

* * *

Another thing the court will require because the Courts have held that we cannot make any distribution of assets unless we know precisely what the value of a pension is and whether it is distributable. *** I want an actuary in here or somebody in authority to give us some value on that and you can stipulate it away if you *** like. You can stipulate to the value. If you can't, you better get an actuary."

Respondent's attorney replied:

"We can stipulate as to that. It's pretty well spelled out in the form."

Several other references were made to the pension fund during subsequent hearings, at each of which the trial court expressed concern for the respective rights of the parties with regard thereto and about the lack of precise computations as to its present value. Despite the court's diligent requests for this information, at no time did respondent provide or seek to introduce any data, actuarial or otherwise, establishing the present value of the pension or conflicting with the figures he personally supplied to the court and to which the parties stipulated regarding his total contribution to the plan and the amount of monthly benefits payable when he is eligible to retire.

In an appeal involving a dispute over pension benefits with facts

strikingly similar to those before us, the court in *In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 54, 448 N.E.2d 545, stated:

"The real tenor of respondent's argument is that the court's lack of adequate information to be used in valuing [his] pension rights is somehow attributable to the court. As we stated above, however, it was the parties' responsibility to present the requisite data to the trial court, especially since the court repeatedly requested additional data. ***

We here opine that this case presents a situation which this court sees all too often in dissolution cases. Despite the fact that numerous hearings regarding the division of property were held and that only a limited amount of property was involved, neither party presented the trial court with solid evidence of the properties' value so that the court could make the fairest possible division of the parties' assets. We again emphasize that it is the parties' obligation to present the court with sufficient evidence of the value of the property. Reviewing courts cannot continue to reverse and remand dissolution cases where the parties have had an adequate opportunity to introduce evidence but have failed to do so. Parties should not be allowed to benefit on review from their failure to introduce evidence at trial. [Citations.] Remanding cases such as the one before us would only protract the litigation and clog the trial courts with issues which should have been disposed of at the initial hearing. As the trial court here said after numerous hearings in this case, at some time, we must 'ring the curtain down.' " (114 Ill. App. 3d 47, 54-55, 448 N.E.2d 545, 550.)

Similar comments were made by the courts in *In re Marriage of McCartney* (1983), 116 Ill. App. 3d 512, 452 N.E.2d 114, where, in affirming the property division order appealed from, the court adopted the reasoning in *Smith* and declined to consider tables and actuarial data concerning the value of husband's pension presented for the first time on appeal, stating that he had ample opportunity to present such evidence at trial and that to rule that the trial court's valuation was in error would be to improperly place the responsibility for gathering evidence on the trial court rather than on the parties; and *In re Marriage of Miller* (1983), 112 Ill. App. 3d 203, 445 N.E.2d 811, in which this court held that where the parties stipulate to the value of a pension plan and do not thereafter introduce any contrary evidence, they will be bound by their stipulations and cannot raise the absence of valuation evidence for the first time on appeal as grounds for reversal and remandment.

Having provided—and stipulated to—the amounts of his contribution in the pension plan and of his expected monthly benefits based thereon, and having thereafter failed to present any data which would contradict those figures or establish the present actuarial value of the plan, respondent's contention that the trial court somehow erred in failing to place a specific value on it is clearly without merit.

Furthermore, we believe that the holdings in *Smith, McCartney* and *Miller*, and particularly the reasoning expressed in the above-quoted passage from *Smith*, are equally applicable to respondent's contention as to the absence of an accurate valuation of the real estate owned by the parties and his argument, as we understand it, that the portion of the judgment ordering him to quitclaim his interest in the property was improper because it was based on the trial court's "erroneous finding that he had no interest in it" despite the evidence indicating "that he made every effort to save the buildings but was prevented from doing so by petitioner's refusal to sell."

The record discloses that at different times during the marriage, the parties purchased two three-flat apartment buildings in Chicago—one on West Berwyn Avenue and another on North Campbell Avenue—where the parties resided until respondent left the marital residence in February 1983. At the outset of trial, on February 21, 1985, the parties stipulated that the total value of the properties was $220,500, but that a combined mortgage held thereon by Albany Bank & Trust Company in the amount of $145,000 was in foreclosure and that the net equity after estimated foreclosure costs of more than $3,000 was between $75,000 and $80,000. It further appears that shortly thereafter, on March 25, 1985, the mortgage was foreclosed and a default order and personal deficiency judgment was entered against the parties. The property was then sold, on or about May 1, 1985, at a sheriff's sale and a deed issued, the chancery court having determined that the parties waived their right of redemption. Meanwhile, knowing that the property was in foreclosure but unaware of the course those proceedings had taken, the trial court repeatedly requested that the parties present evidence as to the status and value, if any, of the real estate, and throughout the trial there was considerable testimony and discussion thereabout. For instance, at a hearing on April 30, 1985, petitioner stated on cross-examination that the houses were to be sold the following day and agreed with the statements of respondent's attorney that "as a practical matter *** they are not an asset as far as you and your husband are concerned *** and they may even turn out to be a liability." At the same hearing, respondent testified, when asked the status of the buildings, that it

was his belief they were "to be auctioned off." Noting the earlier stipulation that there was a net equity of nearly $80,000, the court admonished counsel, "We are dealing now with a very substantial asset and we have got to know everything there is to be known about [it]," at which point respondent testified regarding the acquisition of the buildings and the circumstances leading to the subsequent default on the mortgage, stating, *inter alia*, that the rents from the property had not been sufficient to meet the expenses; that he stopped making payments on the mortgage in January 1984 when his savings were exhausted; and that although he had proposed they sell the houses, petitioner, at that time, refused. He acknowledged, however, that he did not appear at or take any steps to defend the action for foreclosure. When the trial court inquired if anything could be done to save the property, respondent's attorney stated, "I guess unless the buildings were redeemed, and the economics of it is impossible, there is no way." At a later hearing, on July 23, 1985, petitioner testified that she was seeking reconsideration and vacatur of that portion of the foreclosure judgment finding a waiver of the right of redemption and that, if unsuccessful, she would file an appeal therefrom. In closing arguments, her attorney proposed that unless respondent agreed to share in the expenses of the liabilities on the property and of the legal proceedings necessary to redeem it, he should be ordered to execute a quitclaim deed of his interest in it. In response thereto, respondent's attorney stated:

> "[D]espite the fact that they are putting the blame on [respondent], because he did nothing, there is some indication he didn't have the funds or the wherewithal. But at some later date, after the horse had run away, that [petitioner], at least somebody in her behalf, her parents, have now dived into the act in an attempt to salvage the buildings, if they put up the finance costs. If that's what it takes, then perhaps they should reap the benefits."

The following colloquy then took place between the court and respondent's attorney:

> "THE COURT: Are you making a demand on this real estate?
>
> COUNSEL: I am making no demands on that, Judge, but I am saying—
>
> * * *
>
> THE COURT: You don't want to exercise the option that [petitioner's attorney] has given you?
>
> COUNSEL: I have been informed by my client that finan-

cially, he is unable to take advantage of any *** these excessive costs, or these costs that [petitioner's attorney] states is a possibility to rescue the buildings."

Counsel also stated, when summarizing his position regarding the financial circumstances of the parties, that the court should keep in mind "that [petitioner] is already starting out with some $1,500, rather a substantial amount of jewelry and furs and the possibility of getting some benefits from the two homes."

■ While we normally attempt, for the sake of brevity, clarity and judicial economy, to avoid lengthy recitations of the evidence and quotations from the record, in this case the portions of the record referred to and quoted above so clearly refute respondent's assertions regarding the absence of evidence of the value of the real estate and the trial court's "erroneous" finding that he had waived any interest in it as to obviate the need for further discussion of his arguments. Parenthetically, we note that on March 27, 1986—approximately three months after this appeal was filed but nearly three weeks before respondent filed his brief in it—another division of this court reversed that portion of the foreclosure judgment which found that petitioner had waived her right of redemption in the property and ordered that she be allowed the statutory period within which to redeem it. *Albany Bank & Trust Co. v. Albany Bank & Trust Co.* (1986), 142 Ill. App. 3d 390, 491 N.E.2d 1234.

Similarly, with respect to the remainder of the property, we note that in the "Final Trial Memorandum" prepared by respondent's attorney, which is, essentially, a brief, line-item summary of the pertinent data relating to the parties' assets and liabilities, respondent valued the household furnishings at $10,000, petitioner's jewelry at $15,000, and her furs at $5,000. In view thereof, we are at a loss to understand respondent's claim that these assets were of "substantial but unknown value." See *In re Marriage of Mullins* (1984), 121 Ill. App. 3d 86, 458 N.E.2d 1360.

■ In any event, he had ample opportunity to amend those figures at any time during the seven-month period over which these hearings extended and, indeed, was effectively invited to do so when the court pointedly directed the attorneys to submit a valuation of the household property, cautioning counsel,

"Unless these people determine between themselves who gets what out of this house, I'm going to insist that somebody get into that house; let them bear the expense, if necessary, give me a valuation of what's in that house. *** I want these people to be able to sit down and *** determine what to do about the

\*\*\* items that are in that house. If they can't, they reach an impasse, they'd better do this or I'll do it in my own fashion as best I can. Better get somebody in that house to make an inventory and make a valuation."

Both parties thereupon indicated their belief that they could reach agreement on the division of their possessions. Thereafter, during final argument, respondent's attorney presented to the court, over the initial objection of opposing counsel, a list of the household items which respondent specifically requested in negotiations with petitioner; and while it is true that he indicated that the list was not intended to be exclusive, respondent does not state nor is there anything in the record showing what, if anything, he otherwise requested but was denied. To the contrary, the record shows that on at least two occasions, counsel for petitioner stated, without response from respondent, that, with the exception of a dining-room hutch, she agreed that he should be awarded everything on the list he submitted. In other words, respondent not only failed to present to the trial court any guidelines as to what he considered an "equitable distribution" of their personal possessions or any evidence that his initial valuation thereof was incorrect but, indeed, gave the court abundant reason to believe that it was simply effectuating the division agreed upon by the parties in out-of-court negotiations when it awarded to respondent everything on the list, including the disputed hutch. In the light thereof, he cannot now complain that the distribution of household furnishings to which he apparently acquiesced was inequitable.

In summary, we find that although the trial court's diligent and repeated requests for precise valuations were, in most instances, disregarded by the parties, it nevertheless had before it sufficient evidence of the overall value of the assets—including respondent's own testimony and estimations concerning his pension benefits, the household furnishings, and petitioner's nonmarital property as well as uncontradicted evidence that the mortgage on the apartment buildings was in foreclosure and that there were various liabilities incident thereto—as to enable it to structure a comprehensive and equitable distribution, review of which respondent, by reason of his actions and omissions at trial, has waived.

■ Respondent next contends that the trial court erred in ordering him to reimburse petitioner $2,673 in arrearage payments for utilities supplied to the marital residence following their separation, arguing that the original support order unambiguously directing him "to continue to pay utility bills" was superseded by a later order stating only that "[petitioner] shall submit all future utility bills to [him] im-

mediately"; and that he was, therefore, justified in believing that he was no longer obligated to pay them. We disagree.

Initially, we note that the second order to which respondent refers was entered on June 15, 1984, after a hearing in which he was found in contempt of court "for failing to pay utility bills previously ordered" and given 30 days within which to purge himself of the contempt finding by paying all outstanding bills and reimbursing petitioner for those she had already paid. While we are of the opinion that the order might have been more artfully drafted, it is clear enough from the substance and the absence of any contradictory language therein that its purpose was not to vacate the previous order but, rather, to compel respondent to comply with it and that the directive to petitioner to promptly submit all future bills to him was inserted simply to avoid future controversy by ensuring that he was made aware of them as they became due. We find this to be the only reasonable construction and are not persuaded otherwise by respondent's postulation that the trial court intended the utility bills to be paid by petitioner out of the increase, from $250 to $450 per month, in the support payment granted her in that same order. In the first instance, the $450 temporary maintenance award was not technically an "increase" in her support payment since the original payment of $250 in the previous year's order was specifically designated as child support. It was only after petitioner became unemployed that she sought and was granted temporary "family support." Furthermore, if respondent's hypothesis were correct, there would be no reason for her to submit to him "immediately" upon receipt bills which were her sole responsibility. In any event, considering the respective incomes and financial circumstances of the parties, we find no abuse of discretion in the trial court's determination that respondent was better able to assume these debts.

Respondent's final contention is that the trial court erred in ordering him to pay a total of $6,500 in fees to petitioner's attorneys, arguing that she is financially more able to pay them than is he, and that, in any case, the fees were inflated, duplicative, and unreasonable.

Pursuant to the authority granted in section 508 of the Illinois Marriage and Dissolution of Marriage Act, the trial court, "after considering the financial resources of the parties, may order either spouse to pay a reasonable amount for his [or her] own costs and attorney's fees and for the costs and attorney's fees necessarily incurred by the other spouse." (Ill. Rev. Stat. 1985, ch. 40, par. 508(a).) The propriety of an allowance of fees is dependent upon a showing by

the party seeking them of an inability to pay and a corresponding demonstration of the ability of the other spouse to do so. (*In re Marriage of Bussey* (1985), 108 Ill. 2d 286, 483 N.E.2d 1229; *In re Marriage of Weinberg* (1984), 125 Ill. App. 3d 904, 466 N.E.2d 925.) However, as we stated in *Weinberg*, "it is not necessary for the spouse seeking fees to divest her capital assets [citation], deplete her means of support, or undermine her economic stability [citation] in order to pay them" (125 Ill. App. 3d 904, 919, 466 N.E.2d 925, 935), since the inability to pay need not be tantamount to destitution (*In re Marriage of Brooks* (1985), 138 Ill. App. 3d 252, 486 N.E.2d 267). See *In re Marriage of Lovell* (1981), 98 Ill. App. 3d 865, 424 N.E.2d 995.

■■ Once it has been determined that an award of fees is appropriate, the trial court must then decide whether the amount is reasonable, considering, *inter alia*, the nature of the controversy and the complexity of the issues involved, the skill and standing of the attorneys retained, the time and labor they expended, the usual and customary charge in the community, and the results achieved. *In re Marriage of Angiuli* (1985), 134 Ill. App. 3d 417, 480 N.E.2d 513; *In re Marriage of Weinberg* (1984), 125 Ill. App. 3d 904, 466 N.E.2d 925.

Finally, it is well settled that the decisions regarding the propriety of allowing attorney fees and the appropriate amount thereof are matters within the sound discretion of the trial court and will not be disturbed on review absent a clear showing that such discretion was abused. *In re Marriage of Bussey* (1985), 108 Ill. 2d 286, 483 N.E.2d 1229; *In re Marriage of Melnick* (1984), 127 Ill. App. 3d 102, 468 N.E.2d 490.

■■ As to the respective financial resources of the parties, the record discloses that as of the time of dissolution, petitioner, though trained as a draftsman several years ago, had been unable to find suitable employment and that her personal income was $90 per week from unemployment benefits which, combined with the $675 support allowance from respondent, provided her with a net monthly income of less than $1,100 for her and the minor child's support. In contrast, respondent was employed by the Federal government at an annual salary of $38,000 from which he received a net monthly income of $2,025. Deducting the $675 support payment, he was left with $1,350 for his own use. While it is true, as he points out, that in addition to the monthly support award and the $5,500 attorney fees at issue, he was also required to pay $2,673 for the utility bills discussed above and $1,000 for attorney fees incurred by petitioner prior to June 1984, as well as $600 toward the minor son's orthodontic expenses, we note that he had been ordered to pay the utility bills and attorney

fees as part of a temporary support order, more than a year before judgment for dissolution, but had failed to do so and that petitioner had also paid $1,000 in attorney fees to her second attorney. In any event, we agree with the trial court's finding that petitioner's income was insufficient to cover the costs and fees incurred during this litigation and that because of his superior earning power and potential for acquiring additional assets respondent was better able to bear those expenses. We are not persuaded otherwise by respondent's additional argument that petitioner was awarded substantial marital and nonmarital assets, including the two pieces of real estate, $1,500 in savings, and a considerable amount of jewelry and furs which could be converted into cash, and, therefore, was capable of assuming responsibility for her own fees. As noted above, the law is clear that a party need not deplete her savings or divest herself of assets awarded to her so as to pay attorney fees (*In re Marriage of Lovell* (1981), 98 Ill. App. 3d 865, 424 N.E.2d 995). We find that maxim particularly appropriate here, where the assets respondent suggests she sell consist of household furnishings from the marital residence and several pieces of jewelry and various fur coats given to her by her parents and grandparents.

■ Respondent further asserts that notwithstanding the propriety of the trial court's determination that he was financially more capable of assuming the costs of the litigation, the amount of the fees awarded to petitioner's second attorney were excessive in that the charges were inflated and duplicative and that the hourly rates were unreasonable. In this regard, we note that the trial court conducted a comprehensive hearing on the matter of fees whereat petitioner's attorneys both testified and were subject to cross-examination as to the nature of the services they performed, whether either had duplicated the work of the other, what amount of time they spent on various tasks and the rates they charged therefor. After considering this testimony and the arguments made by counsel and reviewing the fee petitions, the trial judge concluded, *inter alia,* that the case involved a considerable amount of time and work and involved relatively complex issues relating to the pension and to the simultaneous foreclosure of the real estate—which, he surmised, might have been salvageable had the parties been more cooperative—but also specified that any services relating strictly to the foreclosure action were not chargeable in the dissolution proceeding; that the charges were supported by their petitions; and that their hourly rates were reasonable. Observing, however, that "there is not enough money here to pay [for] the services *** that were rendered," the trial judge awarded petitioner's

second attorney $2,150 less than what he had requested, stating, "I think I have cut these lawyers down to the knees, so to speak ***." We also find it noteworthy that petitioner's first attorney, having stated to the court that the time indicated in his petition was far less than what he had actually spent on the case, nevertheless voluntarily deducted an additional 11 hours for work he performed which was thereafter duplicated by his successor. In the light thereof, and absent evidence that this reduction did not serve to eliminate any alleged excess charges, we cannot say that the trial court's award constituted an abuse of discretion.

For the reasons stated, the judgment of dissolution as ordered by the trial court is affirmed.

Affirmed.

LORENZ and PINCHAM, JJ., concur.