*In re* MARRIAGE OF STEPHANIE L. DODGE, Petitioner-Appellee, and JOHN M. DODGE, Respondent-Appellant.

First District (5th Division)   No. 1—87—2469

Opinion filed May 26, 1989.

Linda S. Kagan, of Chicago (Douglas P. Maloney, P.C., of counsel), for appellant.

Barbara B. Hirsch, of Chicago, for appellee.

JUSTICE LORENZ delivered the opinion of the court:
This appeal follows a contested trial for dissolution of marriage. Respondent, John M. Dodge (John), contends the trial court abused its discretion regarding three aspects of the judgment: determination of the amount, duration, and period of review of a maintenance award to respondent, Stephanie L. Dodge (Stephanie); the requirement that John pay $184,000 to Stephanie as her share of John's profit sharing plan; and the award of $10,000 in attorney fees and costs to Stephanie.
We affirm.
John and Stephanie were married in 1961. At the time of trial in May 1987, John was 49 years old and Stephanie was 46 years old. The Dodges had two children: a son, age 24, then emancipated and living out of State, and a daughter, age 22, then a senior at the University of Wisconsin in Madison.
Summarized below are facts pertinent to the disposition of the issues raised on appeal.

SUPPORT AND MAINTENANCE
Since 1961, John was employed with Commerce Clearing House (CCH) and, at the time of trial, was an assistant vice-president. The parties stipulated that in 1986, John earned $75,503.89 in gross salary and was awarded a year-end bonus of $11,500, receipt of which he elected to defer to 1987. Had he not deferred receipt of the bonus, John's total income from CCH for 1986 would total $87,033.89. John stated he regularly received bonuses in December from CCH in addition to his yearly salary. John lived in a newly constructed, mortgage-free townhouse, which he purchased in 1985.
At trial, Stephanie testified she had briefly worked part-time in an obstetrician's office and as a dental assistant. In 1975, she began part-time work at the Deerfield Public Library. She later worked at the Northbrook Public Library and began working full time there in 1980. She received $14,623.60 and $15,737.12 in compensation for years 1985 and 1986, respectively. Stephanie had recently accepted a job offer with the American Library Association (ALA) as assistant to the director in the children's division. Stephanie was to begin in May 1987 at an annual salary of $18,000. The salary range for that position was $17,000 to $24,000.
Stephanie testified that her educational background included attending one year of college prior to her marriage, several continuing

education courses, and seminars in conjunction with her library job.

Stephanie resided alone in the marital home in Deerfield where the couple had lived for 18 years. She testified that her daughter occasionally spent weekends there and that, following graduation from college, her daughter would live with her. Her son also occasionally visited over weekends.

Stephanie stated that the house was approximately 30 years old. Various repairs were needed, including minor plumbing work and repair of a hole in the kitchen floor. The home had not been recarpeted since purchase. The kitchen stove and oven as well as the washer and dryer were 18 years old. The dishwasher and garbage disposal were eight years old. A new refrigerator was installed in 1984.

A budget, containing projected monthly expenses, was offered into evidence upon John's counsel's stipulation that Stephanie would establish the amounts and items listed therein. The expenses totaled $4,245. John's counsel questioned Stephanie about various projections.

With reference to the marital home, the budget contained a projection of $325 per month for appliances and home maintenance. Stephanie admitted that she had not obtained any estimates for plumbing work or painting. She also admitted that an estimate of $1,100 for repair of the kitchen floor was three years old.

With reference to insurance, Stephanie included a $100 life insurance expense in the budget even though her present employer provided life insurance and the ALA would provide $15,000 worth of life insurance. She also admitted that the ALA provided 75% of the cost of medical insurance, but had included $250 as projected medical insurance expense because of uncertainty as to the extent of the ALA plan's coverage. The amount budgeted for medical insurance was based on a discussion she had with her sister, who was employed in the medical division of Kemper Insurance.

Regarding an expense for church contributions, Stephanie admitted that in 1986 she was only able to make contributions of $25 per month to her church, but had included projected monthly contributions of $100.

Stephanie was also questioned about the budget projection of $400 per month for clothing and $75 for dry cleaning. She stated that in April 1987 she spent close to $400 for clothing. She admitted, however, that she did not purchase clothing in the preceding months of January or March and purchased only a "small amount" in February. Stephanie stated that in April 1987 she spent approximately $35 for dry cleaning expense, but was unable to recall how much she spent in February or March. She explained, however, that the $75 projected

monthly expense for dry cleaning was based on discussions with friends and the circumstances of her new job in the city.

John's counsel pointed out discrepancies between amounts for items contained in an earlier budget, considered in conjunction with a petition for maintenance in 1985, and that offered at trial. In her later projections, Stephanie included a $250 monthly expense for an automobile. During questioning, however, she admitted that her current car payment was only $107 and that the $250 projection was based on a new car purchase. She also explained that the earlier budget reflected a lower projection for automobile maintenance than did the later budget due to her increased knowledge of costs of maintenance and because her car was older. She similarly explained that increased projections for groceries and laundry contained in the later budget were partly due to her developing knowledge of actual expenses for those items. Stephanie stated that John was primarily responsible for the payment of bills.

Based on the evidence adduced at trial and as stipulated to, the trial court, on June 12, 1987, ordered John to pay Stephanie monthly maintenance of $2,100, which amount was reviewable at the request of either party after five years. Maintenance was to continue until such time as Stephanie remarried, entered into cohabitation on a continuous conjugal basis, or died.

### THE CCH PROFIT SHARING PLAN

The parties offered into evidence a trial stipulation addressing John's interest in the CCH "Employees Profit Sharing, Savings, and Stock Ownership Plan" (plan). As of March 31, 1987, John's fully vested interest in the plan totaled $436,304.59. Of that amount, $184,193.52 represented John's contributions.

The parties also agreed to the admission of two exhibits regarding the plan. The first, a group exhibit, labeled "Petitioner's Exhibit 103," consisted of copied pages of John's quarterly statement of account through December 31, 1986. When examined in conjunction with the stipulation, that exhibit established that, as of December 31, 1986, John's tax-deferred (before tax) contributions were $15,876.27, his after-tax contributions were $43,049.33, and company contributions totaled $81,172.27. The second exhibit, labeled "Petitioner's Exhibit 104," was a booklet summarizing the plan's provisions.

Relevant here, paragraph 25 of the stipulation provided:

> "25. JOHN M. DODGE may withdraw the amount of $184,193.52 as of March 31, 1987. Withdrawals are governed by the terms [of] par. 601A of Petitioner's Ex. 104, but the

plan has now been additionally modified so that if a person withdraws up to the amount of after-tax contributions there are no penalties."

The parties further stipulated John could withdraw all sums from the plan after reaching the age of 59½. Before reaching that age, John could withdraw sums from the plan under financial hardship. The plan's provisions included, as examples of such hardship, the purchase, construction or reconstruction of a principal residence, sickness, accident, death in the family, and tuition expenses.

Based on evidence regarding the plan, the trial court found that, as of March 31, 1987, John's fully vested interest totaled $436,304.59. The court order John to pay Stephanie $184,000 within six months of judgment, payment to represent full satisfaction of any claim as beneficiary.

ATTORNEY FEES AND COSTS

Following trial, on May 19, 1987, a hearing was held on Stephanie's counsel's petition for fees. The court indicated, at that time, that counsel's verified petition, filed August 22, 1985, as modified, and supplement, filed May 12, 1987, would stand as counsel's direct testimony. Those documents set out the dates of work performed in conjunction with the case and amount charged. The documents established fees totaling $19,846.90, of which Stephanie had paid $3,000.

John's counsel, after reviewing the petitions, did not dispute the amount of time expended nor the reasonableness of the rate charged. Counsel argued, however, that Stephanie, by virtue of the property division, did not lack the ability to pay her own attorney fees. Imposition of fees, counsel stated, must be conditioned on proof of Stephanie's inability to pay and John's ability to do so and that, because of the nature of the property distribution, John would necessarily incur debt to pay the fees requested.

The court ordered respondent to pay $10,000 of the total amount of fees incurred by Stephanie. The court found that without invading the principal of the $184,000 payment from John, Stephanie did not have the ability to pay the entire amount of fees. However, the court determined Stephanie could pay the remaining balance of unpaid fees, totaling $6,846.90, and could invade the principal of the $184,000 to do so.

OPINION

We consider, in turn, each of the issues raised on appeal.

First, John contends the maintenance award is not supported by

the record. He argues that because neither of the Dodges' children lived with Stephanie in the marital home, and because it was mortgage-free, Stephanie could realize substantial proceeds from its sale, presumably in place of maintenance. John also notes that in May 1985, after a pretrial hearing, temporary maintenance was set at $1,500 per month and, although Stephanie's gross salary was only then $14,623, she was able to increase savings and IRA account balances. John argues that budgeted expenses for clothing, church donations, medical insurance, dry cleaning, automobile, groceries, and home maintenance did not reflect actual expenses, but constituted projections of desirable amounts.

John further contends maintenance should not have been made subject to review because Stephanie was employed full time, was only 46 years old, and enjoyed good health. Rather, John argues, the award should have been limited in duration to 18 months from the date of judgment, when John was to pay Stephanie her share of John's interest in the CCH plan.

■ In evaluating John's arguments, we observe that trial courts enjoy broad discretion in awarding maintenance pursuant to section 504 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 504), and appellate courts will interfere with such awards only where no reasonable man would agree with the judgment rendered. (*In re Marriage of Johnson* (1982), 106 Ill. App. 3d 502, 436 N.E.2d 228.) After carefully examining the record in light of that standard of review, we do not conclude the award was improper either in amount, duration, or because it was subject to review.

John's contention that maintenance was unnecessary because sale of the marital home could generate substantial proceeds is based on *In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 441 N.E.2d 336. In *Bentivenga*, John states, denial of maintenance to the wife was affirmed "in part, on the assumption that the wife could sell the marital residence in the near future," suggesting a similar consideration should govern here.

■ We do not believe the holding in *Bentivenga* can be reasonably read to include such an assumption. With respect to the denial of maintenance, the court simply noted that the division of marital property to the wife, which included projected proceeds from sale of the marital home divided between the parties, was mostly in cash and, when considered with her salary, constituted sufficient income. (*Bentivenga*, 109 Ill. App. 3d at 971, 441 N.E.2d at 339.) Moreover, a wife has no obligation to sell her assets to generate income to support her-

self where the husband has sufficient income to meet his needs while meeting hers. *In re Marriage of Heller* (1987), 153 Ill. App. 3d 224, 505 N.E.2d 1294.

■ Nor do we agree with John's argument that the award should be disturbed in view of the amount of temporary maintenance previously set. John has provided no authority to support that position. Propriety of maintenance awards must be assessed in relation to evidence adduced at trial concerning the parties' circumstances to determine what is just, rather than in relation to the amount of temporary maintenance ordered in preliminary proceedings.

■ Further, we decline to substitute our own judgment in place of the trial court's and so alter the amount of maintenance on the basis of John's contention that certain budget projections did not reflect actual expenses. At most, the record contains conflicting testimony as to expenses. Stephanie established, via stipulation of her testimony of items and amounts contained in the budget, the standard of living during the marriage. John, in his own testimony, presented no evidence in contradiction. The trial court had opportunity to consider Stephanie's testimony, on cross-examination, concerning discrepancies in budgeted amounts. We are satisfied that the above evidence was carefully considered and, because the issue becomes, essentially, one of credibility, we find no basis to disturb the award. *In re Marriage of Kaplan* (1986), 149 Ill. App. 3d 23, 500 N.E.2d 612.

■ Last, we are not persuaded by John's argument that Stephanie's age, employment, and good health are factors which should preclude review of the maintenance award. We held in *In re Marriage of Heller* (1987), 153 Ill. App. 3d 224, 505 N.E.2d 1294, that the award of permanent maintenance to a healthy 47-year-old college-educated woman, free of raising a family, who anticipated $15,000 annual income as a travel agent, warranted review and was an abuse of discretion. While we are aware of differences between *Heller* and the instant case, we conclude that consideration of changes in the parties' income and expenses which necessitated review there is also appropriate here and support the determination that review is proper. (See *Heller*, 153 Ill. App. 3d at 235-36, 505 N.E.2d at 1301.) Acceptance of John's argument ignores the occurrence of such changes.

John next contends the trial court failed to give adequate consideration to adverse tax consequences to John when it awarded payment of $184,000 from the CCH plan. John states payment was based upon an inaccuracy in paragraph 25 of the trial stipulation, indicating John's total contributions were available for withdrawal without penalty. However, John states only his after-tax contributions, totaling

$43,049.33 as of December 31, 1986, could be withdrawn without penalty.

Considerable discussion was had at the trial's outset regarding the stipulation. John's counsel stated that paragraph 25 was inaccurate because it indicated that contributions including before-tax amounts of the total $184,193.52 interest could be withdrawn without penalty. The court acknowledged counsel's concerns regarding paragraph 25 and stated that that portion of the stipulation could not be considered conclusive. Over Stephanie's counsel's objection, the trial judge indicated he would allow John's counsel to withdraw paragraph 25 and would permit evidence on the matter. However, because Stephanie's counsel had relied on the stipulation in excusing witnesses from CCH regarding withdrawals from the plan, the court agreed that John's counsel could vary the stipulation only through testimony of the plan's administrator, not John's own testimony. The court therefore conditioned withdrawal of paragraph 25 upon John's counsel's production of the plan's administrator "for the purpose of ascertaining what number should be inserted into paragraph 25, if any number other than what is there now."

During the third day of trial, after the close of Stephanie's case, John's counsel advised the court that he had been in contact with CCH and had learned that, although subpoenaed by him, John Hartman, the plan administrator, would not appear to testify. The trial judge indicated that responsibility for asking the court for an order enforcing the subpoena rested with John's counsel. The trial judge again indicated that variance with the stipulation depended on evidence presented by John's counsel and that the court would make a determination, at that time, regarding paragraph 25. The trial judge stated he would consider the subpoena filed and continued on a daily basis. Trial proceeded.

Although John's counsel presented evidence in the form of John's testimony that John's after-tax contributions totaled $43,049.33 as of December 31, 1986, the record reflects he did not call as a witness the plan administrator nor seek to enforce the subpoena.

John now asserts that although that testimony would have been "helpful," the court had sufficient information in the form of relevant exhibits and John's testimony to find that only $43,049.33 was available for withdrawal without penalty and, thus, remand is proper.

We begin our consideration of the issue by focusing on the language of paragraph 25 of the stipulation as set out above. While the first sentence of paragraph 25 indicates John may withdraw $184,193.52 as of March 31, 1987, from the plan, it is clear the para-

graph's second sentence is intended to explain the terms of such withdrawal. Concerning penalties for withdrawals, the first clause of the second sentence directs attention to paragraph 601A of exhibit 104, the booklet summarizing the plan's provisions. Paragraph 601A provides for the withdrawal of any or all after-tax contributions at any time. There is no language in paragraph 601A indicating any penalties in conjunction with withdrawal of after-tax contributions. Penalties are incurred under paragraph 601A only in conjunction with withdrawal of before-tax contributions before the plan member reaches age 59½. Penalties include a six-month suspension on contributions to the plan, limitation on employer year-end contributions to the excess of calendar year contributions over withdrawn amounts (not to exceed 6% of compensation), and potential loss of a year of service for purposes of vesting computations.

The second clause of the second sentence of paragraph 25 is curiously worded and appears to indicate paragraph 601A was modified to eliminate penalties in conjunction with withdrawal of after-tax, *not* before-tax amounts. The clause states the plan, as modified, allowed withdrawals "up to the amount" of such contributions without penalty. We observe that unless the language "up to the amount" is read "all contributions including both before-tax and after-tax dollars," the purported modification does not vary the provisions of paragraph 601A.

To that extent, we agree with John that paragraph 25 of the stipulation is not conclusive as to the amount of John's contribution which could be withdrawn without penalty. Nevertheless, we must disagree that remand is appropriate here.

We have before addressed the propriety of remand in view of parties' obligations in marriage dissolution actions to provide, at trial, sufficient evidence enabling the court to make an informed property distribution. For example, in *In re Marriage of Skahn* (1986), 149 Ill. App. 3d 764, 501 N.E.2d 229, we declined respondent's urgings to remand the matter for determination of the present value of pension benefits because, notwithstanding repeated requests by the court, respondent neglected to provide, or seek to introduce, any data to establish the value as of the time of trial. We reasoned there that remand was not appropriate because respondent had adequate opportunity to introduce evidence pertaining to property value, but failed to do so. See *Skahn*, 149 Ill. App. 3d at 768-69, 501 N.E.2d at 232.

Similarly, in the instant case, although John was given opportunity to present evidence to clarify the stipulation, he failed to do so.

As we have noted, the record is clear that the trial judge was aware of the inconclusiveness of the stipulation regarding the potential penalties regarding withdrawals. On two occasions, discussions were had with John's counsel concerning the need to have the plan administrator produced in order to clarify paragraph 25. The record shows John's counsel failed to produce the plan administrator or seek a contempt citation for his failure to appear. In the absence of that testimony, the trial judge was presented with a confusing stipulation and conflicting evidence as to how much of the $184,193.52 was available for withdrawal without penalty. We decline to find fault with the trial court's resolution of the matter and allow John to benefit by his failure to introduce, or seek to introduce by enforcement of the subpoena, the testimony of the plan administrator in light of the admonitions of the trial court to do so.

Last, John argues that by ordering payment of $10,000 in attorney fees to Stephanie, the trial court failed to balance the financial obligations imposed on John against the debt-free assets and payments awarded to Stephanie. Specifically, John points out Stephanie's gross income, including maintenance, totaled approximately $43,200, in contrast to his own net income, after taxes and maintenance payments, of $65,000, out of which he was to pay for his daughter's postgraduate education, if any. He also states that, apart from attorney fees, Stephanie had no substantial debts and received marital assets totaling $330,000. John also contends the trial court improperly based its order, in part, on Stephanie's counsel's efforts to have John held in contempt of court.

■ Generally, although attorney fees are the responsibility of the party for whom services were rendered, courts may order one spouse to pay the other's fees after considering the financial resources of both. (Ill. Rev. Stat. 1985, ch. 40, par. 508; *In re Marriage of Einhorn* (1988), 178 Ill. App. 3d 212, 533 N.E.2d 29.) A decision regarding fees will not be disturbed on review absent an abuse of discretion. (*Einhorn*, 178 Ill. App. 3d 212, 533 N.E.2d 29.) The award of $10,000 in fees to Stephanie was not such an abuse.

■ As we have summarized above, the record reveals the trial court carefully considered the parties' respective financial positions and Stephanie's ability to pay fees. We are not impressed by John's argument to the contrary, which takes into consideration Stephanie's annual gross salary as opposed to John's net income. Further, we find the insinuation that the trial court's award of fees was, in part, a punitive measure based on Stephanie's counsel's efforts to have John held in contempt of court a mischaracterization of the record. The

transcript of the court's comments on May 19, 1987, to which John directs us, reveals that the court noted the amount of fees was justified by efforts of Stephanie's counsel in conjunction with "non-settlement of the case," "trial of the case," and "concerning rules to show cause and other matters that were in the case." In other words, the sum total of activity associated with trial of the cause.

For the above reasons, we affirm the judgment of the circuit court.

Affirmed.

MURRAY, P.J., and PINCHAM, J., concur.