David A. HORTON, Appellant,

v.

Eileen V. HANSEN, Appellee.

No. S–858.

Supreme Court of Alaska.

June 20, 1986.

W.G. Ruddy, Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellant.

Thomas W. Findley, Findley & Burnham, Juneau, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This appeal arises from a marriage and partnership dissolution proceeding before Superior Court Judge Rodger Pegues. The marriage was annulled by a partial summary judgment order. The property claims were resolved after both a lengthy hearing before an appointed special master, and a nonjury trial. Judge Pegues awarded appellee, Eileen Hansen, $72,000 as her pro rata share of the partnership, $20,586 in actual and punitive damages, $1,689.28 in costs and $21,932.11 in actual attorney's fees. The issues on appeal are: (1) Whether the superior court erred in awarding Hansen a share of the assets of Squire's Rest Tavern pursuant to the partnership agreement; (2) Whether the superior court erred in determining that Squire's Rest earned a profit during 1979; (3) Whether the superior court erred in assessing punitive damages against Horton; and (4) Whether the superior court erred in awarding Hansen her actual attorney's fees. We affirm the trial court's order in all respects except for the punitive damages award. We remand for recalculation of damages.

## I. FACTS AND PROCEEDINGS BELOW

### A. *The Facts*

David Horton, appellant here and plaintiff below, owned a number of businesses and properties in the Juneau and Auke Bay areas. The parties' dispute centers on one of these properties, a bar known as "Squire's Rest."

Appellee Eileen Hansen went to work as a bartender for Horton in April 1978. In June or July of 1978, Horton asked her to manage Squire's Rest. Shortly thereafter Horton asked her to marry him. Hansen testified that she initially resisted because she was not "in love" with Horton. She was ultimately persuaded because Horton assured her that it was solely a business arrangement that would benefit both her and her children. Horton testified that he thought he was in love with her and that initially business had nothing to do with it. However, he further testified that "she [Hansen] had the right qualities to work with me in the bar and she got along well with people" when asked why he got married.

The parties married in Reno, Nevada in August 1978. They lived separately for four or five months. After much prodding by Horton, Hansen ultimately moved into Horton's house in early 1979, but they never had sexual relations.

In March of 1979, Horton and Hansen signed a written partnership agreement for the ownership of Squire's Rest. Horton testified that he instigated the partnership agreement after they were married. The agreement was retroactive to January of 1979. The partnership agreement was drafted by a Juneau attorney, Fred Baxter, who testified that Horton wanted to give Hansen "due consideration [for] her efforts and time that she spent working at the tavern." He further testified that Horton wished "to alleviate any problem or disagreement that he might have with his own family." Baxter recalled that Horton provided the ownership percentages for the partnership and set them so that he retained control.[1] Baxter also testified that Horton valued Squire's Rest at $150,000 and Baxter put that figure into the agreement. According to Baxter, this was a reasonable value for Squire's Rest because the liquor license alone was worth $85,000 —$100,000. Under the agreement Hansen's name was to be put on the liquor license.

Hansen was very active in the management of Squire's Rest and a number of her children worked there and at Horton's Auke Bay Hardware Store. She was instrumental in the expansion of Squire's Rest to include a disco and an enlarged dancing area. Hansen's children did the majority of the construction work.

From the time she was hired in April 1978 until January 1979, Hansen earned $269 per week as a bartender at Squire's Rest. After the partnership agreement went into effect, she no longer expected wages but rather her share of the partnership profits. Horton valued the job of bar manager at $50,000 a year.[2] But he alleged that there were no profits from the partnership with which to pay a salary.

Horton's business operations were at best disorganized. One highly questionable bookkeeping method involved voiding the cash register tapes on a register which operated only on busy nights. Hansen subsequently found the void tapes and kept them. She produced them at trial and they helped document Squire's Rest's 1979 earnings.

While the Horton-Hansen business relationship and marriage was developing, Horton continued a sexual relationship with June Herrin Stevens (Herrin) begun in March of 1978. This relationship lasted until well after he filed for dissolution in December of 1979. Herrin testified that she did not learn that Horton was married to Hansen until September 12, 1979 although she saw him regularly throughout 1978 and 1979 as a sexual partner and companion. Herrin also testified that after she found out about the Hansen/Horton marriage, Horton told her that the marriage was only a business arrangement, that there was no personal involvement, and that he would get an annulment or divorce.

After Herrin discovered the marriage, the business arrangement between Horton and Hansen became strained. Horton told Herrin that his partnership with Hansen was not going the way he wanted and that he wanted Hansen out of the picture. Toward that end, Horton embarked on a bizarre scheme. In November 1979 Horton and Herrin took a trip to California, and visited a longtime friend of Hansen, Gene Lopes. Lopes and Hansen apparently had had a sexual relationship prior to Hansen's move to Juneau in 1978. Herrin and Horton both testified about the visit with Lopes. Herrin testified that Horton wanted Lopes to know that he and Hansen were married in the hope that Hansen would get angry with Horton and quit. Horton testified that the main purpose of the California trip was to visit Lopes to check on phone calls made to Lopes on the Squire's Rest phone. While in California, Horton and Herrin arranged for flowers to be sent to Hansen anonymously, from various locations, over a period of time, with the intent that Hansen believe they came from

---

1. The percentages were set at 52% for Horton and 48% for Hansen.

2. The partnership agreement provided for salaries to each partner.

Lopes.[3] They similarly had cat food labels sent to Hansen which said "Bright Eyes," apparently Lopes' pet name for Hansen.

While Horton was on his mission in California, Hansen remained in Juneau operating Squire's Rest. She testified that Horton left her without sufficient funds to run the operation. The band and other employees who had not been paid threatened to file suits with the Labor Board. Hansen sought the advice of attorney Baxter. He advised closing the bar until Horton returned, and she did so.

When Horton returned on December 5, 1979, Hansen had moved out of the house. He testified that the bar was cold and the pipes were frozen. However, Herrin testified that the pipes did not freeze until December 10th or 12th. Shortly before Christmas, Horton filed for divorce.

### B. *Proceedings Below*

Horton filed his complaint for divorce and property division on December 21, 1979. He requested that the partnership be dissolved and the parties be awarded their "actual contributions." Hansen answered and counterclaimed. She also petitioned for the dissolution of the partnership but requested specific property interests including, *inter alia*, the liquor license and two parcels of property. On April 21, 1981, Judge Thomas B. Stewart signed an order annulling the Horton/Hansen marriage and reserving property and other claims for later determination.

In the property division proceeding, Judge Pegues appointed a special master to sort out the financial affairs of Squire's Rest. The special master, Jean Boone, heard lengthy testimony from Marsha Ramsey, Horton's daughter and bookkeeper, and issued two documents—a financial report and findings and recommendations. The special master's report extensively detailed the problems with the bar's financial records and attempted to reconcile Ramsey's testimony and the various documents. In her findings and recommendations, Master Boone detailed the contested matters of the partnership, each side's claims, and her recommendations. She did not adopt the figures of either party but reached independent conclusions on most items.

Judge Pegues adopted the special master's findings after determining that none of those findings were clearly erroneous. He also heard testimony on Hansen's counterclaim. Judge Pegues then issued a scathing decision against Horton.

[T]he court finds that Horton has willfully, intentionally, and in callous disregard of Hansen's rights, fabricated; lied; destroyed, purposely or recklessly lost, or withheld evidence; and repeatedly attempted to mislead the court in an effort to defeat Hansen's legitimate claims against him. His course of conduct throughout has been aimed at trying to pay her a dime for a dollar, and when that was not wholly successful, because she resisted and used self-help to try to make him keep his part of the bargain, he set out to oust her and to alter the facts of their business relationship to prevent her from receiving what was due under their agreement. To say that he engaged in deceit and chicane is to put it mildly.

Judge Pegues found that AS 32.05.-160(a)[4] required Horton to account for all profits made during the partnership and that Horton had failed to do so.[5] Furthermore, Judge Pegues found that Horton's wrongful acts entitled Hansen to damages. AS 32.05.330(b)(1).[6] Adopting the special

---

3. Lopes apparently had a travelling job, hence flowers from unfamiliar cities would be attributed to him.

4. AS 32.05.160(a) provides:

Every partner shall account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

5. The agreement itself also requires an accounting at the close of each calendar year.

6. AS 32.05.330 provides in part:

(a) When dissolution is caused in any way, except in contravention of the partnership

master's findings, the court assessed these damages at $6,862. The court then trebled this amount as a punitive award. Judge Pegues also awarded Hansen actual attorney's fees because Horton's conduct required her to incur fees in excess of those otherwise necessary.

## II. STANDARD OF REVIEW

We review Judge Pegues' order under the clearly erroneous standard set forth in Civil Rule 52(a).[7] Primarily at issue here are the parties' interpretations of the events leading up to this litigation. Judge Pegues found Horton not to be a credible witness and determined that "any disputed testimony resting on his credibility must be and [was] resolved against him except where other, credible evidence corroborated his testimony."

We have addressed the clearly erroneous standard of review many times. "Where, as in the case at bar, the superior court's decision depends largely on oral testimony and on inferences to be drawn from such testimony, this court must give due regard to the trial court's opportunity to evaluate the credibility of witnesses." *Curran v. Hastreiter*, 579 P.2d 524, 527 (Alaska 1978) (citations omitted). *See also Frontier Saloon, Inc. v. Short*, 557 P.2d 779, 782 (Alaska 1976). Additionally, we must take a view of the evidence most favorable to the prevailing party at trial. *Curran*, 579 P.2d at 527; *Frontier Saloon*, 557 P.2d at 782. We can neither reweigh the evidence relied upon by the trial court nor substitute our own judgment for that of the trial court. *Martens v. Metzgar*, 591 P.2d 541, 544

(Alaska 1979); *Stansberry v. Manson*, 420 P.2d 449, 450 (Alaska 1966).

> [T]his court will only disturb trial court findings when we are convinced that they were clearly erroneous; that is, when we are left with a definite and firm conviction on the entire record that a mistake has been made....

*Martens*, 591 P.2d at 544 (citations omitted).

## III. DISCUSSION

### A. *The Superior Court Properly Awarded Hansen a Share of the Squire's Rest Assets Pursuant to the Partnership Agreement.*

In its January 1985 decision and order, the superior court awarded Hansen 48% of the value of the partnership plus damages for breach of the agreement. The court made no marital property division, however, because it found no true marital relationship. This distinction between partnership and marital property is the key to evaluating the parties' arguments.

While correctly acknowledging that a husband and wife may enter into a partnership agreement,[8] Horton argues that Hansen should not be permitted to recover on the partnership agreement because the marriage was annulled. He reasons that the parties should be returned to the *"status quo ante"* on the annulment of a marriage. Horton asserts that "any interspousal transfer of property, made in consideration of marriage is, like the marriage itself, void and of no effect." Contending that Hansen received the business interest

---

7. Civil Rule 52(a) provides in part:

> Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

8. *See Northern Lights Motel v. Sweaney*, 561 P.2d 1176, 1187 (Alaska 1977) (tenants by the entirety can also be copartners in managing the jointly owned property), *modified*, 563 P.2d 256 (Alaska 1977).

agreement, each partner, as against his co-partners ... may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners.

(b) When dissolution is caused in contravention of the partnership agreement the rights of the partners are as follows.

(1) Each partner who has not caused dissolution wrongfully has

(A) all the rights specified in (a) of this section, and

(B) the right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement.

as consideration for her marriage vows, Horton urges us to find that the trial court erred in not voiding the partnership agreement when it voided the underlying marriage.

Horton misses the distinction made by the trial court and seriously misinterprets the facts as given by Hansen and by his own testimony. Judge Pegues treated the partnership as a relationship entirely separate from the marriage. He specifically refused to award a division of marital assets, but found that while neither party was "an ideal business partner," a partnership nevertheless existed. Consideration for the partnership was found in Hansen's uncompensated work as bar manager prior to the agreement and her agreement to continue in that capacity. He found support for the partnership division and the damage award in AS 32.05.330.[9]

■ Horton assumes that the partnership was the consideration for Hansen's marriage vows. When asked about the genesis of the agreement, however, Horton himself admitted: "I believe that it was my agreement" and that discussions about the agreement took place "right after we got married." He also testified that at the time the agreement was signed, attorney Baxter asked what Horton wanted in the agreement. Horton stated that "this [the text of the draft agreement] is what I wanted in it." Baxter's testimony indicates that Horton willingly and actively participated in making the agreement. Hansen testified that "[t]he partnership was not offered with the marriage." Admittedly, Hansen entered into the marriage for business reasons. However, the evidence is undisputed that the parties did not even contemplate a partnership agreement until well after the August 1978 marriage. Thus, the partnership was not the consideration for the marriage. The trial court properly considered the partnership apart from any marital involvement.

■ Judge Pegues specifically addressed the appearance of unfairness in awarding Hansen 48% of the value of Squire's Rest since the partnership lasted only a year. He concluded that the partnership agreement was not unconscionable when made, since Horton entered the agreement voluntarily, seeking a "cheap business partner," and the cheap labor of Hansen's sons. We recognize "the basic tenet that competent parties are free to make contracts and that they should be bound by their agreements." *Inman v. Clyde Hall Drilling Co.*, 369 P.2d 498, 500 (Alaska 1962). Courts will not enforce contracts, however, that are unconscionable. *Id.* (quoting *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 327–28, 62 S.Ct. 581, 599–600, 86 L.Ed. 855, 877 (1942)). Determination of unconscionability is a question of fact. *Inman*, 369 P.2d at 500; Restatement (Second) of Contracts § 208 comment f at 111 (1981); 17A C.J.S. *Contracts* § 614(b) (1963); *see also Vockner v. Erickson*, 712 P.2d 379, 381–83 (Alaska 1986). On this record, taken as a whole, we are not convinced that Judge Pegues was mistaken. *Martens*, 591 P.2d at 544.

The trial court then correctly enforced the partnership agreement. The agreement made Hansen a 48% owner of Squire's Rest. Forty-eight percent of $150,000 equals $72,000. AS 32.05.330[10] contemplates a division of partnership assets where one partner wrongfully violates the agreement. Judge Pegues specifically found that Horton "willfully, intentionally, and callous[ly]" disregarded Hansen's rights under the partnership. He found that Horton failed to account for partnership profits, failed to cooperate reasonably with Hansen in furtherance of the partnership and frustrated her performance under the agreement.

■ We will not reverse a trial court's findings unless they are clearly erroneous. *Martens*, 591 P.2d at 544. Judge Pegues had an opportunity to evaluate all the testimony and evidence before him. We will

---

**9.** *See supra* note 6.

**10.** *See supra* note 6.

not substitute our judgment for his. We therefore affirm the division of partnership assets. Hansen is entitled to the $72,000 awarded by the trial court.

B. *The Superior Court Properly Determined that Squire's Rest Earned a Profit in 1979.*

The special master found that Squire's Rest earned a profit of $13,724 during 1979 and the superior court awarded Hansen $6,862 as her pro rata share. Horton contests this finding, arguing that the trial court erred in accepting the special master's finding that rental payments by Squire's Rest totaled only $13,110 for 1979.

Squire's Rest was located on property owned by Horton Properties, Inc., and leased to David Horton d/b/a Auke Bay Boat House (a/k/a Squire's Rest). Horton contends that the commercial lease obligated Squire's Rest to pay Horton Properties $42,000 per year for 15 years. The special master found that checks totalling only $10,850 were produced where "rent" was designated. Using rent figures for prior years averaging $12,139, the special master recommended $13,110 as the appropriate rent expense ($12,139 plus 8 percent for inflation). The court implicitly adopted this figure in accepting the final net income figure of $13,724.

Horton also objects to the finding that insurance expenses were only $3,253 rather than the $14,413 alleged by Horton. The special master discounted Horton's claim because Horton and Marsha Ramsey stated that Horton's figure included payments not related to Squire's Rest and because insurance costs for previous years were between $3,152 and $4,063. The special master

again averaged and added eight percent for inflation in reaching the $3,253 figure.

Judge Pegues adopted the special master's findings and recommendations on both issues. He found that they were not clearly erroneous, considering that the special master had the opportunity to hear the witnesses and arguments and to consider the documents in reaching her decision. Indeed, Judge Pegues considered the master's analysis to be "on the conservative side." We agree.

■ We see no reason to discount the special master's and the trial court's findings on either issue. The only bases for Horton's claimed errors are the inflated figures he proffered for rent and insurance. The judge found him incredible and discounted his testimony. Judge Pegues ruled against his version as Horton was unable to corroborate his testimony and figures reliably. The special master used reasonable valuation methods. The trial court's finding that Squire's Rest earned a profit is not clearly erroneous. However, the trial court miscalculated Hansen's pro rata share of the $13,724 profit. She should only have received 48% of the profit,[11] or $6,587.52. On remand the trial court must adjust the damages award.

C. *The Court Properly Granted Actual Attorney's Fees to Hansen.*

Horton argues that the trial court erred in granting Hansen actual attorney's fees of $21,932.11. He contends that "[i]n contested litigation where the court's monetary judgment exceeds $10,000, the rule states that fees should be assessed at ten percent of the recovered amount."[12] Civil Rule 82(a)(1). Making such a calculation, Horton contends that Hansen should have

---

**11.** *See supra* note 1.

**12.** Civil Rule 82(a)(1) provides:
Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein:

ATTORNEY'S FEES IN
AVERAGE CASES

| | Contested | Without Trial | Non-Contested |
|---|---|---|---|
| First $2,000 | 25% | 20% | 15% |
| Next $3,000 | 20% | 15% | 12.5% |
| Next $5,000 | 15% | 12.5% | 10% |
| Over $10,000 | 10% | 7.5% | 5% |

received $9,258.60. Horton, however, ultimately acknowledges that the trial court has discretion to direct a fees award different from the scheduled amount.

■ This court will only interfere with the exercise of the trial court's discretion in awarding attorney's fees when it has been abused. "An abuse of discretion is established where it appears that the trial court's determination as to attorney's fees was manifestly unreasonable." *Palfy v. Rice*, 473 P.2d 606, 613 (Alaska 1970) (citation omitted). "The award of full attorney's fees is 'manifestly unreasonable' in the absence of a bad faith defense or vexatious conduct by the losing party." *Mullen v. Christiansen*, 642 P.2d 1345, 1351 (Alaska 1982) (quoting *Davis v. Hallett*, 587 P.2d 1170, 1171–72 (Alaska 1978)).

Horton's attorney contends that Judge Pegues' award was unreasonable since Horton did not act vexatiously at trial. He analyzes Horton's age and circumstances and concludes that "[h]is trial conduct was a normal reaction which only reflected his age and his belief that he was right ...."

■ Judge Pegues found Horton's court conduct inappropriate. He explicitly characterized Horton's distortion of the facts as "abnormal." As required, Judge Pegues stated the reasons he granted actual attorney's fees. *Mullen*, 642 P.2d at 1351; *Farnsworth v. Steiner*, 601 P.2d 266, 272 (Alaska 1979). "By his misconduct Horton succeeded not only in preventing Hansen from documenting her legitimate claims but also in causing her to incur costly attorney's fees in a wasteful effort to reconstruct the business records and to draw from him the facts which he knew full well but which he adamantly insisted upon having forgot."

Horton points to no facts or circumstances justifying his behavior other than his age and anger over the "short-lived" relationship. Nor does he make more than conclusory statements as to why the award was "unreasonable." We refuse to reverse this attorney's fees award for unreasonableness. "Vexatious"[13] appropriately describes Horton's behavior at trial.

D. *The Superior Court Erred in Awarding Hansen Punitive Damages.*

Hansen submitted a post-hearing memorandum on October 18, 1983, nearly a year after the special master's hearing on October 28, 1982 and the trial of Hansen's counterclaim on October 26, 1982. In that document, Hansen summarized the hearing from her perspective. She requested both a specific division of partnership property and, for the first time, punitive damages of $50,000.

■ We must reverse the punitive damages award. Punitive damages are inappropriate as punishment for Horton's disruptive behavior at trial. The appropriate punishment for obstructing a judicial proceeding would be contempt proceedings pursuant to AS 09.50.020[14] and additional costs awarded to Hansen pursuant to AS 09.50.040.[15] A party is guilty of contempt if he or she is deceitful or abusive of the process or proceedings of the court, AS 09.50.010(4), or if he or she unlawfully interferes with the proceedings of the court. AS 09.50.010 (9).

V. CONCLUSION

We affirm the trial court's division of the partnership, the assessment of profits and

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court in its discretion in a reasonable amount.

13. "Without reasonable or probable cause or excuse." Black's Law Dictionary 1736 (rev. 5th ed. 1968).

14. AS 09.50.020 provides in part:
A person who is guilty of contempt is punishable by a fine of not more than $300 or by imprisonment for not more than six months.

15. AS 09.50.040 provides in part:
If a loss or injury to a party in an action or proceeding has been caused by the contempt, the court, in addition to the punishment imposed for the contempt, may give judgment in favor of the party aggrieved and against the person guilty of contempt for a sum of money sufficient to indemnify that party and to satisfy the costs and disbursements of that party.

the award of actual attorney's fees. Since Hansen is not entitled to a punitive award, and since the trial court miscalculated the compensatory award, we remand for recalculation of damages. A hearing may be held to ascertain whether Horton's conduct amounted to contempt. If so, then the court may determine whether Hansen incurred any additional costs. AS 09.50.-040.[16] AFFIRMED in part; REVERSED and REMANDED in part.

MATTHEWS, Justice, joined by RABINOWITZ, Chief Justice, dissenting.

I dissent from that portion of the majority opinion affirming the special master's and trial court's estimate of rent and insurance expenses in 1979.

The rent for 1979 was calculated by averaging the rent paid in the preceding three years. By 1979, however, the bar had been expanded from approximately 1200 to 4000 square feet. While the special master and the trial court were free to disallow unverified expenses claimed by Horton, in my view an estimate of rent which fails to take into account this major expansion is clearly erroneous.

Likewise, I believe the estimate of $3,253 for 1979 insurance expenses, based on the average insurance expenses for the preceding three years, is clearly erroneous. Horton presented checks totalling $14,413.44 written to various insurance companies for various items of coverage, including workers' compensation, vehicle insurance, and fire and liability insurance. Of the eleven checks, seven were drawn from the Squire's Rest account, were signed by Eileen Hansen, and were identified as being for workers' compensation insurance. These seven checks totalled $9,159.90. The remaining checks were drawn from the Squire's Country account and were signed by Horton. Horton indicated that the Squire's Rest account was not used to pay for expenses incurred by his other business entities. There is no evidence to the contrary. Therefore, I would allow $9,159.90, plus a reasonable estimate of the fire and liability insurance for Squire's Rest, as expenses for 1979.