Jay W. HARTLAND,
Appellant/Cross–Appellee,

v.

Patricia A. HARTLAND,
Appellee/Cross–Appellant.

No. 3459.

Supreme Court of Alaska.

July 7, 1989.

Rehearing Denied Oct. 25, 1989.

**638**

Ray C. Preston and David L. Allison, Law Offices of Ray C. Preston, A.P.C., Juneau, for appellant/cross-appellee.

Deborah A. Holbrook, Juneau, for appellee/cross-appellant.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

### I. FACTS AND PROCEEDINGS

This divorce case involves two cross appeals from the lower court's division of the couple's marital property and subsequent efforts to enforce that division.

Patricia Hartland and Jay Hartland were married on May 5, 1969. Both are college graduates. At the time of trial, Patricia was employed as an elementary school teacher for the Juneau School District and Jay was employed as a stockbroker for Shearson Lehman Brothers. Jay was 43 years old, Patricia was 44, and their daughter, Andrea, was 11 years old. Patricia's 1985 gross income was $48,588. Jay Hartland's salary was based upon commissions. Consequently, his income ranged from $116,840 in 1983 to $46,812 in 1985.

On May 6, 1986, Jay Hartland filed a complaint for divorce. Before trial, the parties reached an agreement whereby Patricia would have sole custody of Andrea until she reached the age of majority. Jay was to pay $500 a month child support. On October 29–31, 1986, a bench trial was held on the property division issues before Judge Duane Craske.

The court valued the party's marital assets and liabilities as of October 31, 1986, the last day of the trial and the effective day of the divorce. The court found that the total value of the marital assets was $324,186. The court then awarded 60 percent of the assets to Patricia and 40 percent to Jay. The greater percentage to Patricia was to compensate her for Jay's personal use of marital assets over the year prior to the divorce.

In particular, the court valued Patricia's retirement benefits at $26,618 and Jay's retirement benefits at $38,525. The court awarded the couple's stock in PEP Boys, American Express and Lenora Explorations to Patricia. A subsequent dispute arose over transfer of these stocks to Patricia. Both parties appeal.

### II. DISCUSSION

Jay appeals arguing that 1) sufficient evidence was not presented so as to properly value their retirement benefits; 2) the court improperly relied on fault in making the property division; 3) the court erred in not granting a new trial under Rule 60(b)(6) because of his former attorney's malpractice; 4) he should not have been held in contempt for delay in transferring certain stocks to Patricia; and 5) the court erred in two separate awards of attorney's fees to Patricia.

Patricia cross-appeals arguing that the court erred by 1) failing to recapture and charge to Jay's share of the property division all of the marital assets dissipated by him after the parties separated; 2) failing to include in the marital estate certain compensation earned by Jay prior to the date of evaluation; and 3) failing to award Patricia all, or substantially all of her attorney's fees.

#### A. *Issues Arising Out of The Property Division*

1. Did the Court Err in the Evaluation of the Parties' Retirement Benefits?

Jay Hartland argues that the court possessed insufficient evidence to properly val-

ue the parties' retirement benefits. Patricia argues that any lack of evidence on Jay's retirement benefits is due to his own failure to produce additional evidence. As to the claim concerning her retirement benefits, Patricia argues that Jay never refuted the $26,618 figure at trial. She further argues that she fully complied with Jay's discovery requests and that all the terms of her teacher's pension are public information.

After being subpoenaed, Jay produced a 1985 statement from Shearson Lehman indicating his accrued retirement benefits as of January 1, 1985. This statement only provided information regarding the annual benefit which he could expect to receive at a retirement age of 65. He stated that he had checked on more recent information and that Shearson hoped to have a 1986 statement out before the end of the year.

Patricia then served the office manager of Shearson Lehman Brothers with a subpoena to obtain these documents. She was again told that no information was available on the status of Jay's retirement benefits until a Shearson Lehman audit was completed at the end of 1986.

Patricia served a second subpoena for these and related documents just before trial. The judge and counsel had an extended discussion at trial concerning the difficulties in Patricia's obtaining needed documents. The court expressed its skepticism concerning the unavailability of the retirement data and noted that if records were being unreasonably withheld he would resolve any doubt against that party.

At trial, Jay did not present any further evidence as to the value of his retirement benefits. Neither party presented evidence as to the present value of future payments under either pension plan. Neither party attempted to discount these future payments to present value terms. Patricia introduced the 1985 statement and questioned Jay concerning it. Patricia also introduced evidence as to Jay's life expectan-

cy. In closing argument, Patricia calculated the amount which Jay could be expected to receive over his life expectancy after age 65 on the basis of the 1985 statement. At trial, Jay made no objection to the calculation. The trial court accepted this valuation in its Findings of Fact and Conclusions of Law.

### i. Standard of Review

Alaska Statute 25.24.160(a)(4) grants the trial court broad discretion in fashioning a property division in divorce actions. *Laing v. Laing*, 741 P.2d 649 (Alaska 1987). In *Moffitt v. Moffitt*, 749 P.2d 343, 346 (Alaska 1988), this court explained:

> The division of property by the trial court is a three-step process: Step one—determining what property is available for distribution—is reviewed under the abuse of discretion standard, although it may involve legal determinations to which this court applies its independent judgment. *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983). The second step—placing a value on the property—is a factual determination that will be upset only if there is clear error. Alaska R.Civ.P. 52(a). Step three—allocating the property equitably—is reviewed purely under the abuse of discretion standard and "will not be disturbed unless it is clearly unjust." *Wanberg*, 664 P.2d at 570.

This court will disturb the trial court's valuation of marital property only if it is clearly unjust. *Bousquet v. Bousquet*, 731 P.2d 1211, 1213 (Alaska 1987).

Jay argues that the valuations of the parties' retirement benefits are unjust because the court should have recognized the insufficiency of the evidence presented and required additional evidence before attempting to value these benefits. This argument is without merit.

█ The cases Jay cites involve situations in which neither party presented any evidence as to the value of the retirement benefits.[1] In contrast, Patricia presented

---

**1.** *Perry v. Perry*, 133 Mich.App. 453, 350 N.W.2d 275, 277, 278 (1984) (no attempt was made by either party to place a present value on the pension); *Willis v. Willis*, 19 Ohio App.3d 45,

the 1985 statement into evidence and presented evidence as to Jay's life expectancy. She did not present further evidence of the plan's terms because Jay failed to supply such information when subpoenaed. In denying Jay's motion for a new trial the trial court noted, "This court believes that any error in the valuation was the result of the position taken by plaintiff [Jay Hartland] to not provide complete information about his job benefits." Without such information, expert testimony would have been futile. *See* B. Goldberg, *Valuation of Divorce Assets* § 9.4, at 248–49 (West 1984) ("Unfortunately, however, there is only one way to value [a pension plan]; by reading the plan in the entirety, so that it will be understood regarding rights granted thereunder").

■ Alaska law clearly permits a trial court to resolve a finding of fact against a party whose vexatious, contemptuous, or obstructive behavior causes the trial court to have insufficient evidence. *Moffitt*, 749 P.2d at 349 n. 7; *Gabaig v. Gabaig*, 717 P.2d 835, 842–43 (Alaska 1986). Courts in other jurisdictions have reached similar results.[2]

■ Moreover, regardless of any obstructive efforts by Jay, a party who fails to present sufficient evidence at trial should not be allowed on appeal to challenge the inadequacy of evidence. For example, in *National Bank of Alaska v. J.B.L. & K. of Alaska, Inc.*, 546 P.2d 579, 590 (Alaska 1976), this court noted that the trial court's damage award for the breach of a covenant not to compete was incorrect since the damage award should have only included net lost profits. The court noted, however, that the bank could not challenge the error on appeal since it had failed to

produce further evidence and was therefore "not in a position to claim the trial court erred in using the figures they supplied." *Id.*

The Illinois courts have held that the parties rather than the court have a duty to present evidence on the value of marital assets. As the court noted in *In re Marriage of Smith*, 114 Ill.App.3d 47, 69 Ill. Dec. 827, 832, 448 N.E.2d 545, 550 (1983):

We here opine that this case presents a situation which this court sees all too often in dissolution cases. Despite the fact that numerous hearings regarding the division of property were held and that only a limited amount of property was involved, neither party presented the trial court with solid evidence of the properties' value so that the trial court could make the fairest possible division of the parties' assets. We again emphasize that it is the parties' obligation to present the court with sufficient evidence of the value of the property. Reviewing courts cannot continue to reverse and remand dissolution cases where the parties have had an adequate opportunity to introduce evidence but have failed to do so. Parties should not be allowed to benefit on review from their failure to introduce evidence at trial. Remanding cases such as the one before us would only protract the litigation and clog the trial courts with issues which should have been disposed of at the initial hearing. As the trial court here said after numerous hearings in this case, at some point we must "ring the curtain down."

(Citations omitted).[3]

In reviewing the record, we concluded that there is sufficient evidence of the value of Jay's retirement benefits to allow the court to consider the issue. Under the

---

482 N.E.2d 1274, 1277 (1984) (neither party presented evidence as to retirement benefits' value and judge did not assign any value to the asset).

**2.** *See In re Marriage of Glusek*, 168 Ill.App.3d 987, 119 Ill.Dec. 658, 523 N.E.2d 126 (1988); *In re Marriage of Tyrrell*, 132 Ill.App.3d 348, 87 Ill.Dec. 546, 547, 477 N.E.2d 523, 524 (1985) ("Here, the respondent not only failed to furnish valuation evidence on his own behalf, but he also obstructed the petitioner's attempts to place

a value on the assets.... The respondent will not be permitted to challenge this result on appeal after he thwarted efforts to value the assets in the trial court.")

**3.** *See also In re Marriage of Skahn*, 149 Ill. App.3d 764, 103 Ill.Dec. 208, 501 N.E.2d 229 (1986); *In re Marriage of McCartney*, 116 Ill. App.3d 512, 72 Ill.Dec. 182, 184, 452 N.E.2d 114, 116 (1983).

cases discussed above, the court had sufficient evidence of the pension's value in the future for it to properly evaluate it in terms of the present property division. The evidence presented was that if Jay were to quit as of January 1, 1985, he would receive an annual retirement benefit of $3,083 beginning when he reached the age of 65, some 22 years after the date of trial. At the age of 65 he would have a remaining life expectancy of 12.4961 years. The court multiplied 12.4961 × $3,083 and valued the fair market value of Jay's pension at the product, $38,525.47.

■ Jay argues that this valuations of his retirement benefits constitutes clear error since it does not discount these future benefits to their present value.[4] We agree.

■ The proper division of a vested pension can be accomplished in either of two ways. The court can either award a lump sum discounted to present value to one party or both, or retain jurisdiction and have payments made to the parties as retirement benefits come due. As we noted in *Laing:*

> Realistically, there is such a variety of pension plan designs that it is impossible to develop any one detailed formula that will produce an equitable result in every instance. Once the pension is vested, the trial court can determine whether the present value or the retained jurisdiction approach is appropriate in a given case and adopt that approach to the specific circumstances presented.

741 P.2d at 658. *See also Rice v. Rice,* 757 P.2d 60, 61 (Alaska 1988) (citing *Laing* ); *Miller v. Miller,* 739 P.2d 163, 166 (Alaska 1987) (trial court directed to recalculate retirement benefits on remand using present value method).

In this case, the court failed to apply either method of division. Consequently, we remand the issue of Jay's retirement benefits back to the trial court for a determination of the benefits' present value. The court may reconsider any related issues and take such further evidence as it deems appropriate.

### ii. Patricia's Retirement Benefits

■ Jay argues that the court erred in valuing Patricia's teacher's retirement. This argument is without merit. Unlike the case with Jay's retirement, Patricia's retirement plan was a matter of public record. For whatever reason, he chose not to call his listed actuary witness as to her pension benefits. By not raising at trial the valuation calculation he advocates on appeal, Jay has waived his rights to contest the issue on appeal. *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985).

### 2. Did the Court Err in Using a Concept of Fault in Dividing the Marital Estate?

Jay argues that the superior court impermissibly relied on fault in the breakdown of the Hartland marriage as a factor in dividing the marital property.

■ One of the factors for determining an equitable division of marital assets set forth in *Merrill v. Merrill,* 368 P.2d 546, 547 n. 4 (Alaska 1962), is "the duration and conduct of each [party] during the marriage." In 1968, the Alaska Legislature adopted AS 25.24.160 which provides that "the court may provide … for the division between the parties of their property … in the manner as may be just, and *without regard to which of the parties is in fault.*"[5] (Emphasis added).

---

**4.** Indeed, if the court had adopted a 5 percent discount rate, the present value of the pension would be $9,620.90. Application of a discount rate of 10 percent would produce a present value of $2,640.90. In light of the parties' failure to introduce evidence of an appropriate discount rate at trial, the trial court should have applied its own determination as to a reasonable discount figure. Ordinarily, this is an evidentiary matter. On remand, the trial court may wish to allow the parties to submit evidence as to the appropriate discount rate in this case. We do not express an opinion as to the correct discount figure. The above examples are used solely to demonstrate the significant difference that discounting to present value can make.

**5.** With regard to pre-marital property, AS 25.24.160 provides that a "court in making the division, may invade the property of either spouse

In its findings of fact involving the *Merrill* factors the superior court stated:

> The equities favor the defendant over the plaintiff with regard to the conduct of the parties during the marriage. The plaintiff's relationship with a third party was a disruptive event in the parties' marriage which led to differences between them and occurrence of domestic violence incidents. The plaintiff was the aggressor against the defendant during those incidents. During the course of the last year, the plaintiff has used marital property belonging to the parties and manipulated it to his advantage. Despite their separation, the plaintiff used the marital property to maintain the same lifestyle to which he had been accustomed. Because of his profession, the plaintiff is better at manipulating figures, accounts and assets. This court finds that he did manipulate assets for his own benefit.

In summarizing its findings, the superior court noted:

> This Court began with the presumption that a 50–50 split between the parties was the fairest division. However, based on the foregoing findings and the evidence adduced at trial, this Court finds that the 60–40 split advocated by the defendant is a fairer allocation of the marital assets. A division which gives 60% of the marital assets to the defendant and 40% to the plaintiff will compensate the defendant for the financial activities of the plaintiff during the year.

■■■ We agree with Jay's reading of AS 25.24.160. Under the concept of no-fault divorce, a court cannot rely on one party's fault in ending the marriage to justifying awarding a greater portion of the marital property to the other spouse. However, reading the court's above statements in context, we conclude that the trial court did not reduce Jay's share because his actions were "disruptive" of the marriage. Rather, the court reduced his share for the entirely appropriate reason that he dissipated substantial amounts of marital assets for his own benefit during the parties' separation.[6]

3. Did the Court Err in Not Recapturing and Charging to Jay Hartland's Share of the Property Division All of the Assets Dissipated by Him After the Parties Separated?

Patricia makes the related argument that the superior court erred in not compensating her for all of the marital assets spent by Jay during the parties' separation. Patricia contends that Jay dissipated some $55,000 in marital assets from the date she left the family home. The superior court judge found that:

> With regard to the issues posed by ... *Schanck v. Schanck,* [717 P.2d 1 (Alaska 1986)] ..., this court finds that the Hartlands did not cease functioning economically as a joint enterprise until the date of divorce, which shall be October 31, 1986.
>
> ... This Court's understanding of the Alaska law is that the Court must compile a balance sheet as of October 31, 1986 of the parties' assets and liabilities. The Court is not aware of any authority which it has to go back and pick up individual items which have already been disposed of by one of the parties. For example, the Court will not include the various items sold by the plaintiff such as the sailboat, silver, Royalty Trust Units, etc. However, the conduct of the parties during the past year is a factor which will be factored into the Court's decision by virtue of the *Merrill* factors which the Court must use in its decision-making.

Although Patricia does not challenge the court's finding as to the date the couple ceased functioning as a joint enterprise,

acquired before marriage when the balancing of the equities between the parties requires it."

6. "Until the marriage ceases to operate as a financial unit, each party has the right to manage and control marital funds." *Streb v. Streb,* 774 P.2d 798, 802, (Alaska 1989). Thus, Jay should not be penalized for expending money to support himself at a normal level. However, it was appropriate to award a disproportionate property share to Patricia because Jay has expended funds exceeding that level. *Id.*

she contends that the court erred by not fully compensating her for the property Jay spent for his own separate purposes after their separation.

■ In *Brooks v. Brooks,* 677 P.2d 1230 (Alaska 1984), this court recognized the ability of a court to recapture dissipated marital property. In *Brooks,* the husband had transferred certain marital property in his name to his children from a former marriage without the wife's consent. The trial court included the property in the marital estate and credited the husband with having received the value of the property. *Id.* at 1232. This court approved of the practice as appropriate under the "conduct during marriage" factor.

The trial court sought to compensate Patricia for the dissipated assets by giving her a larger percentage of the remaining marital estate because it did not believe it had the authority to recapture previously dissipated assets. Because of this incorrect conclusion, we reverse the court's property division and remand the issue to allow the trial court the opportunity to recapture any dissipated assets and then determine the appropriate division of property using the *Merrill* factors. In doing so, the court should take care that it does not double count, that is, recapture dissipated assets and make a preferential award to Patricia because assets have been dissipated.

4. Did the Court Err in Failing to Include in the Marital Estate a $14,000 Retroactive Earnings Payment Earned by Jay Hartland Prior to the Date of Evaluation?

Patricia argues that the trial court erred in failing to include in the marital estate $14,000 in commissions earned by Jay prior to October 31, 1986. The trial court considered the commissions deferred income but reasoned that since Jay had not yet received them, the commissions should not be included as marital property.

Both parties agree that the income was for past services rendered. Jay had been put on a form of probation by Shearson Lehman Brothers for his inadequate per-

formance in 1985. Under this probation, a certain portion of commissions were withheld until he met a certain dollar level in transactions.

Patricia argues that the issue presents a question of law reviewable under the substitution of judgment standard. She cites *Schober v. Schober,* 692 P.2d 267 (Alaska 1984), for the proposition that vested or earned compensation which has yet to be received is divisible property. In *Schober,* this court held that unused personal leave, which could be converted into cash by the person accruing it, is a marital asset. The fact that the unused leave could not all be converted into cash until a number of years after the divorce did not prevent the court from holding that the leave was a marital asset. *Id.*

■ Under *Schober,* Jay's deferred commissions resulting from his employer's probation program should be considered marital property. Consequently, the superior court erred as a matter of law in excluding these commissions from the marital estate. We reverse the court's exclusion of this income from the marital estate and remand for an appropriate division of the asset.

5. Did the Court Err in Failing to Include in the Marital Estate a $24,000 Commission Earned by Jay Hartland Prior to the Date of Evaluation?

■ Patricia argues that Jay had a transaction cancelled and then reinstated after the divorce so as to retain his commission as separate property. Before trial, Patricia learned of the cancellation of the impending transaction and argued at trial that Jay was manipulating his compensation so as to avoid division of the commission. In its findings the superior court noted:

[T]here is no evidence in the record to support the contention that plaintiff did anything wrong with respect to the $500,000 transaction. The court has no equitable concern over plaintiff's conduct with regard to that sale.... The Court will not speculate about the cause of the

cancellation and finds that there was no calculated policy of income-deferment. This factual finding is properly reviewed under the clearly erroneous standard. A finding of fact is clearly erroneous if after reviewing the entire record the reviewing court is left with a definite and firm conviction that a mistake has been made. *Martens v. Metzgar,* 591 P.2d 541, 544 (Alaska 1979). Considering the record before Judge Craske, it cannot be said that the court's findings are clearly erroneous.

The parties' argument over subsequent evidence of the transaction's reinstatement and the reasons for it were never properly presented to the trial court. Patricia first raised the issue as part of her motion for attorney's fees. Jay responded in his opposition papers, and attached his affidavit and that of the customer purchasing the annuity explaining why the transaction was cancelled and then reinstated. Patricia also raised the issue in her opposition to Jay's motion for a new trial. She indicated that if the court granted a new trial on the issue of the retirement benefits, then she "would be forced to seek a similar reopening of the issue of the ... $24,000 commission." The superior court never ruled on the issue of the new evidence as to the commission's reinstatement. Since it was not properly raised and not considered by the superior court, the issue is not properly before us on appeal.

### 6. Did the Court Err in Its Award of $5,000 in Attorney's Fees to Patricia Hartland?

The superior court awarded Patricia $5,000 of attorney's fees and 25% of her costs arising from the divorce action. Patricia incurred $19,000 in actual fees. The court also awarded Patricia $1,100 resulting from her motion to enforce the judgment. Jay argues that the court erred in awarding any fees to Patricia. Patricia argues that the court erred in not awarding her all, or substantially all, of her attorney's fees.

The prevailing party rule used for determining attorney's fee awards under Rule 82 does not apply to fee awards in divorces. *Burrell v. Burrell,* 537 P.2d 1 (Alaska 1975). The relevant considerations are the relative economic situation and earning power of each party. *Id.* at 7. Normally, where both parties have adequate income and are in comparable economic situations, each side should bear their own costs in the divorce action. *See Rhodes v. Rhodes,* 754 P.2d 1333, 1335–36 (Alaska 1988); *Jones v. Jones,* 666 P.2d 1031, 1035 (Alaska 1983). In this case, however, the court specifically found that Jay had engaged in unwarranted delay and had imposed unnecessary costs in the course of the action. Therefore, we conclude that it was not an abuse of discretion to award Patricia $5,000 attorney's fees and 25% of her costs. *See Horton v. Hansen,* 722 P.2d 211 (Alaska 1986).

The award of $1,100 raises a different issue since it arises out of fees generated in enforcing the judgment and not from the divorce action itself. *L.L.M. v. P.M.,* 754 P.2d 262, 264 (Alaska 1988). In *L.L.M.,* we noted that the divorce judgment exception to Civil Rule 82 does not extend to post-judgment modifications and enforcement motions. *Id.* The trial court awarded Patricia twenty hours of attorney's fees at $55.00 an hour for a total of $1,100 for her efforts to enforce the divorce decree. Such an award does not constitute an abuse of discretion under Rule 82.

In conclusion, we affirm the $5,000 award of fees in the divorce action and the $1,100 award of fees for the enforcement of the decree.

### B. *Post Trial Issues*

### 1. Did the Trial Court Err in Failing to Grant Jay's Motion for Relief from Judgment under Rule 60(b)(6)?

Jay argues that the superior court erred in failing to grant relief from judgment under Alaska Civil Rule 60(b)(6). On November 6, 1987, Jay sought relief under 60(b)(6) on the grounds that his former attorney committed malpractice in gathering evidence and violated the Code of Professional Responsibility. Jay argues that

his attorney represented his girlfriend's husband in a divorce action and that this developed into a conflict when Patricia sought to call the husband as a witness.

The superior court denied the motion, finding that the motion should have been brought under 60(b)(1) but that Jay did not qualify for relief because the conduct of his attorney did not constitute "excusable neglect." Jay argues on appeal that his motion was appropriately made under 60(b)(6).

This court will not overturn the superior court's denial of a motion under Rule 60(b) absent an abuse of discretion. *Allen v. Allen*, 645 P.2d 774 (Alaska 1982).

■ In *O'Link v. O'Link*, 632 P.2d 225, 229 (Alaska 1981), this court made clear that clause (6) and the first five clauses are mutually exclusive.[7] Relief under clause (6) is not available unless the other clauses are inapplicable. Moreover, clause (6) is reserved for extraordinary circumstances not covered by the preceding clauses. Time-barred relief under the first five clauses is not allowed under clause (6).

■ Patricia argues that relief from judgment under clause (1) is inappropriate because Jay's attorney's conduct did not constitute "excusable neglect."[8] We agree. As this court stated in *Rill v. State, Dep't of Highways*, 669 P.2d 573, 576 (Alaska 1983), "[a]n attorney's failure to act responsibly toward his or her clients when the attorney could be expected to do so constitutes inexcusable neglect." The *Rill* court noted that the client's appropriate remedy is an action for malpractice. *Rill*, 669 P.2d at 576 n. 1. As commenta-

tors have noted, "[o]utside the default setting, negligent errors of counsel are treated less sympathetically and relief frequently denied on the grounds that the negligent act was inexcusable." J. Friedenthal, M. Kane, A. Miller, *Civil Procedure* 572 (1985).

The grounds for Jay's 60(b) motion are that his former attorney failed to act responsibly towards him by not conducting needed discovery and failing to recognize a prejudicial conflict of interest when he reasonably could have been expected to do so. These allegations present inexcusable neglect not entitled to relief under 60(b)(1).

■ As to relief under the catch-all provision of 60(b)(6), this court has stated that only extraordinary cases are subject to relief under this section. *O'Link*, 632 P.2d at 230. This case simply does not present an extraordinary case for relief under 60(b)(6). Both parties forcefully contested the issues in this case and it is highly questionable whether Jay's attorney's alleged malpractice—even assuming that the conduct was malpractice—appreciably affected the result.

Relief under 60(b)(6) is inappropriate when a party takes a deliberate action they later regret as a mistake. *See O'Link*, 632 P.2d at 229–30 (quoting Wright and Miller). As Professor Moore notes, "a party who takes deliberate action with negative consequences, or who makes an informed choice as to a particular course of action will not be relieved of the consequences when it subsequently develops that the choice was unfortunate." 7 J. Moore, *Moore's Federal Practice* § 60.22, at 60–182 (1985).

---

7. Rule 60(b) provides in part:
   On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
   (1) mistake, inadvertence, surprise or excusable neglect;

   .    .    .    .    .

   (6) any other reason justifying relief from the operation of the judgment.
   The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) no more than one year after the date of notice of the judgment or orders as defined in Civil Rule 58.1(c).

8. Patricia also argues that relief is inappropriate under clause (1) since the motion was not within the one year period. She argues that the date of notice of judgment was October 31 when the judge orally made his findings. This contention is incorrect. Rule 58.1(c)(3) provides that all judgments must be in writing and that date of the notice of judgment is the date shown in the clerk's certificate of distribution on the written judgment.

   In this case, the final written judgment was not entered until March 23, 1987. The clerk's certification was made on the same date. Consequently, Jay's 60(b) motion on November 6, 1987 was within the one year period.

Jay's allegation that his attorney's negligence led him into accepting an unfair child custody agreement is also not a ground for relief under 60(b)(6). Jay was presented with an informed choice, the fact that he chose what he now regards as a poor deal does not justify relief under 60(b)(6).

In conclusion, the court's denial of relief under 60(b) does not leave us with the firm conviction that a mistake was made. Accordingly, we affirm the denial of Jay's claim for relief under Rule 60(b).

2. Did the Trial Court Err by Finding Jay Hartland in Contempt and Awarding Patricia Damages for His Delay in Transferring Certain Stocks?

Jay argues that Judge Craske erred in finding him in contempt for two reasons: 1) the uncontroverted facts do not reveal contemptuous conduct since he was relying on the advice of his attorney; and 2) the use of the contempt power is inappropriate to enforce the non-support aspects of a divorce decree.

Judge Craske issued his findings orally on October 31, 1986, awarding certain stock to Patricia. The written judgment was issued on March 25, 1987. The judgment awarded Patricia the PEP Boys stock, 534 shares of American Express and the Lenora Explorations stock. The judgment stated that:

> [t]he plaintiff shall immediately transfer to defendant all of the American Express stock shares which have already been held by the plaintiff long enough to avoid the recapture tax. The plaintiff shall then promptly transfer the remaining shares within one week after each share reaches the end of the holding period necessary to avoid the recapture tax. All 535 shares of the American Express stock shall be transferred to the defendant no later than 21 months after the date of the divorce decree in this matter.... The date of transfer of possession of all other items shall be November 15, 1986.

After not receiving these stocks, Patricia filed a motion on May 18, 1987, for enforcement of the divorce decree. In response, Jay filed his first motion for a stay. In his May 8, 1987 affidavit, Jay stated that he was "informed that the transfer of the American Express stock will take at least two months to complete."

On July 17, 1987, the trial court issued a decision and order denying Jay's motion for a new trial and granting Patricia's motion for enforcement of the decree. The court ordered Jay to immediately transfer, and execute all documents necessary for such transfer, all of the American Express, PEP Boys, and Lenora Explorations stock. The court noted:

> The finding of this court on the material submitted both at the time of trial and in the moving papers since trial supports the court's finding that plaintiff has intentionally manipulated the parties' assets in a manner calculated to benefit himself and to the detriment of defendant.

> Plaintiff has not provided a satisfactory explanation as to why he has not complied with the decree of divorce. The offered explanation of waiting for a decision on the motion for new trial on the question of the present value of the retirement benefits is not persuasive. No stay was ever granted.

Jay stated in an affidavit that he initiated the process of ordering up the stock certificates for transfer to Patricia within one week's time following the court's July 17 order. According to the deposition of Lori Stone, the operations manager of Shearson Lehman, Jay did not "order up" the PEP Boys stock until August 11, 1987 and the American Express stock until early September 1987. On August 21, 1987, Jay moved to stay the proceedings pending appeal and for the court's approval of an undertaking in lieu of a supersedeas bond. His affidavit of August 21 stated that the stocks were due in late September.

On August 31, 1987, Patricia moved for an order to show cause why Jay should not be held in contempt for having failed to comply with the terms of the divorce decree and the court's order of July 17.

On September 8, 1987, as part of his opposition, Jay filed an affidavit stating that Patricia "has *always* had the ability to sell [the PEP Boys and Lenora stock] at any time, both before the trial and since." (Emphasis in original). After reading the affidavit, Patricia immediately called Deberah Fox at Shearson Lehman to inform her she wanted to sell her stock. She was told that the stock could not be sold while the stock certificates were being ordered up.

A telephonic oral argument on Patricia's motion to show cause was held on September 11, 1987. On September 24, 1987, the superior court issued an order commanding Jay to show cause why he should not be held in contempt. The court also denied Jay's second motion for a stay of proceedings and the offered undertaking. Jay then filed the same motion with this court. We denied his motion on October 22. Prior to our denial of Jay's third motion for a stay, his counsel received the stock certificates for Lenora Explorations and PEP Boys. On October 13, 1987, Jay filed a response to the superior court's order to show cause.

Jay's counsel delivered the stock certificates to Lenora Explorations and PEP Boys on October 19, 1987, four hours after the close of the New York stock exchange. On October 19, now referred to as "Black Monday," the stock market dropped some 500 points. The American Express stock was not delivered until November 4, 1987.

On February 11, 1988, Patricia moved for an evidentiary hearing on the issue of contempt. Jay filed an opposition motion. On March 9, 1988, the court concluded that an evidentiary hearing was appropriate to provide a factual basis for a decision on the contempt issue. Based on the parties' prior agreement to substitute the deposition of Lori Stone for an evidentiary hearing, the superior court reviewed the videotape deposition of Lori Stone.

**9.** Jay relies on two cases, *In re Contempt of Rapanos*, 143 Mich.App. 483, 372 N.W.2d 598, 604 (1985), and *Proudfit Loose Leaf Co. v. Kalamazoo Loose Leaf Binder 32 Co.*, 230 F. 120, 132

On April 13, 1988, the superior court found Jay in contempt for his willful and bad faith failure to transfer stock awarded to Patricia. It determined that Jay's willful and bad faith actions were the legal cause of $28,810 in financial losses suffered by Patricia, and that pursuant to AS 09.50.040, Jay was responsible for those losses and for her full attorney's fees and costs incurred in the contempt proceeding.

### 3. Did Jay's Actions Constitute Contempt—Advice of Counsel as a Defense

In *L.A.M. v. State*, 547 P.2d 827, 831 (Alaska 1976), this court set forth the following requirements for a contempt order:

(1) the existence of a valid order directing the alleged contemnor to do or refrain from doing something and the court's jurisdiction to enter that order; (2) the contemnor's notice of the order within sufficient time to comply with it; and in most cases, (3) the contemnor's ability to comply with the order; and (4) the contemnor's wilful failure to comply with the order.

Jay argues that he did not willfully fail to comply with the court's order because he did so on advice of counsel. This argument is without merit. In *McKnight v. Rice, Hoppner, Brown & Brunner*, 678 P.2d 1330, 1334 (Alaska 1984), this court noted:

Once a party is ordered by a court to assign a claim, that party has a duty to comply with the order forthwith. If the party ignores the order and assigns the claim to a third person, his act would be both wrongful and contemptuous.[2]

---

2. If his attorney had advised such a course of conduct the attorney would share complicitly in the wrong.

(Citations omitted). Implicit in the *McKnight* court's statement in footnote 2 is the proposition that advice of counsel is not a shield when a party ignores a court order.[9]

(6th Cir.1916), for the proposition that advice of counsel is a defense to a contempt action. Neither case provides support for Jay's position. These cases involved prosecutions for criminal

The fact that Jay's counsel was seeking to exhaust all potential avenues of relief from enforcement of the judgment does not justify his failure of more than one year to comply with the court's order to transfer the stock. There was no confusion over the meaning of the court's order to transfer the stock. Both attorney and client were clearly put on notice that their delay tactics were inappropriate when the court issued the July 17, 1987 order.[10]

### 4. Was Use of the Contempt Power Appropriate?

■ Secondly, Jay argues that the use of the contempt power is not available to enforce non-support aspects of a divorce decree. Patricia argues that Jay's argument misconstrues the court's order as somehow involving the enforcement of a money judgment.

Alaska Civil Rule 70 provides:

If a judgment directs a party to execute a conveyance of land or to deliver deeds or other documents or to perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court and the act when so done has like effect as if done by the party.... The court may also in proper cases adjudge the party in contempt.

Under Rule 70, Judge Craske had the authority to hold Jay in contempt for his failure to comply with the court orders directing the transfer of the stock to Patricia. He was not acting to enforce a money judgment. Rather, he directed the transfer of specific property awarded by the decree.

■ The court awarded Patricia $28,810 in damages for Jay's willful failure to transfer the stock pursuant to the authority in AS 09.50.040.[11] However, we are unable to ascertain from the record whether all the stock was sold at one time, or if it was ever sold at all. In order to recover actual damages, Patricia must have sold the stock within a reasonable period after she received it from Jay. In other words, she cannot recover a paper loss and then retain the stock hoping for an increase in its value. Such a scenario would potentially allow for a double recovery. The appropriate measure of damages is the difference in the stock's value when Patricia would have sold it had Jay complied with the court's order and its value when she actually sold it within a reasonable time of receiving the certificates from Jay. We remand the issue to the superior court for its determination of the proper award of damages.

In conclusion, we affirm the superior court's contempt finding but vacate the court's award of damages for the delay in transferring the stock and remand the issue back to the trial court.

### 5. Did the Trial Court Err in Awarding Attorney's Fees to Patricia for Costs Involved in Defending Against Jay Hartland's Motion to Quash the Writ of Execution?

On November 13, Patricia obtained a writ of execution and served it on Shearson Lehman Brothers. On November 20, Jay moved to quash the writ of execution seeking to have Patricia accept certain assets instead of a money payment. On the same day, he also moved for expedited consideration under Rule 77. Patricia opposed the motions arguing that the present motion

---

contempt where a client had in good faith relied on counsel's interpretation of a court order. The court order to transfer the stock in this case was unambiguous and the court made clear that since a stay had not been issued delay in transferring the stock was inappropriate.

10. In its order the court noted: "The offered explanation of waiting for a new trial on the question of the present value of the retirement benefits is not persuasive. No stay was ever granted."

11. AS 09.50.040 provides in part:

If a loss or injury to a party in an action or proceeding has been caused by contempt, the court, in addition to the punishment imposed for the contempt, may give judgment in favor of the party aggrieved and against the person guilty of contempt for a sum of money sufficient to indemnify that party and to satisfy the costs and disbursements of that party.

was a "not so veiled fourth attempt to obtain the same relief which plaintiff has already been denied three times." On December 1, 1987, a telephonic hearing was held on the motion to quash. Jay offered to make the motion moot by paying the $9,800 due on the judgment. On December 2, the court issued its order quashing the writ of execution conditioned on Jay's payment of $9,800. The court also stated that it would consider Patricia's motion for the attorney's fees generated by the expedited motion. The court later awarded Patricia all her fees, or $2,060.10, stating that Jay's motion was "repetitive, frivolous and abuse of proper court procedure."

Jay argues that the court erred in awarding Patricia fees since the motion to quash was justified and an appropriate use of court procedures. In response, Patricia argues that the court made an appropriate award of fees under Rule 77($l$).

Civil Rule 77($l$) states:

The presentation to the court of frivolous or unnecessary motions ... which unduly delay the course of the action proceeding ... for the purpose of delay where no reasonable ground appears therefor subjects counsel presenting or filing such, at the discretion of the court, to imposition of costs and attorney's fees to the opposing party.

"A pleading is 'frivolous' when it is clearly insufficient on its face, and does not controvert the material points of the opposite pleading, and is presumably interposed for mere purposes of delay." Black's Law Dictionary 601 (Fifth ed. 1979).

In the case at bar, Jay sought to quash Patricia's writ of execution on the grounds of financial hardship and to offer to satisfy the obligation with alternative assets. In the alternative, Jay again sought a stay of the proceedings to enforce the judgment under Rule 62(b).

These are not defenses to a properly issued writ of execution. *See* AS 09.35.-010–09.35.330; Alaska R.Civ.P. 69. Since the motion did not facially raise a valid defense, the motion to quash had no function other than as a delay tactic. As a result, Judge Craske was within his author-

ity under Rule 77($l$) in awarding attorney's fees to Patricia for her opposition to the frivolous motion.

In conclusion, we reverse the court's division of the marital estate and remand the case to allow the court to recapture any dissipated marital assets and then determine the appropriate division using the *Merrill* factors. We remand the issue of Jay's retirement benefits for the court's recalculation of their value using a present valuation method. The court is free to reconsider any related issue and take such further evidence as it deems appropriate. We reverse the court's exclusion of certain commissions earned by Jay but not paid until after the date of divorce because of his employer's probation program. The court should determine the exact amount of these commissions and divide them accordingly. As to the court's contempt holding, we vacate the damages award and remand the issue back to the court for its determination of the appropriate amount of damages. We affirm the court's determination as to the remaining issues.

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.